UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **DEBRA KAUFFMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 12-CV-2079 |
| ) | |
| **PETERSEN HEALTH CARE VII, LLC,** ) | |
| d/b/a Mason Point, ) | |
| ) | |
| **Defendant.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#23) filed by Defendant, Petersen Health Care VII, LLC, d/b/a Mason Point (Mason Point). This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Mason Point's Motion for Summary Judgment (#23) is GRANTED.

## FACTS[1]

Defendant Mason Point is a nursing home providing long term care to elderly individuals and is located in Sullivan, Illinois. Plaintiff, Debra Kauffman, began working for Mason Point in May 1981 as a beautician and performed beautician/hair care services for Mason Point's residents in a beauty shop located on the Mason Point campus. Plaintiff was one of two beauticians employed by Mason Point. The other beautician is Nancy Burich. Plaintiff's job required her to be able to carry or lift weights in the range of 10 to 50 pounds.

---

[1] The facts are taken from Defendant's Statement of Undisputed Facts, Plaintiff's Statement of Additional Material Facts and the documents filed by the parties, including deposition transcripts. This court has only included facts which are material to the issues in this case and are adequately supported by the record.

Plaintiff worked from 7:00 a.m. to 5:30 p.m. on Mondays and Tuesdays. On Wednesdays and Thursdays she worked from 7:00 a.m. to 4: 00 p.m. She worked 35 hours during a work week. On Mondays and Tuesdays Plaintiff and Burich served residents who needed assistance in being transported to the beauty shop. Plaintiff testified that after the residents had eaten breakfast and had their meds:

> we would take them and bring them down to the beauty shop, do their hair. And at all times one of us had to stay in the beauty shop because we couldn't leave them there because they would get out of their chair and fall. And then we would do their hair, take them back home; and then get the next one and bring her down, do her hair, take her back home; get the next one, bring her down, take her back home. So Mondays and Tuesdays that's pretty much our day.

Plaintiff testified that the routine on Mondays and Tuesdays involved "[a] lot of walking." Plaintiff testified that the residents were already in their wheelchairs when she went to get them and that, sometimes, the nurses would have them sitting at the desk waiting to be picked up. Plaintiff also testified that the residents stayed in their wheelchairs while she and Burich did their hair. Plaintiff testified that, on Mondays, they only did four to six people if they did perms. On Wednesdays and Thursdays, she and Burich provided services to Mason Point's "home side" residents who were capable of transporting themselves to the beauty shop. However, Plaintiff and Burich still had to retrieve some residents in

wheelchairs on Wednesday and Thursday because they "couldn't get them all done on Monday and Tuesday." Plaintiff testified that "sometimes" a CNA would transport a resident to the beauty salon "if they were making a trip." Plaintiff's duties also included providing manicures, providing services in resident rooms as well as in the beauty salon, cleaning the bird aviary, assisting with laundry, participating in activities with residents and assisting with breakfast and lunch service for residents.

It is undisputed that the Mason Point facility includes a number of residential buildings. At least five buildings house residents and some of those buildings contained multiple floors of residential housing. The path from the residents' rooms to the beauty shop from time to time required Plaintiff to navigate the resident in a wheelchair to elevators, up and over ramps and through a series of hallways. Plaintiff served residents of different sizes ranging in weight from 75 to 400 pounds. Plaintiff estimated that the average resident weighed around 120 pounds. Plaintiff scheduled the residents' appointments an hour apart to allow her time to retrieve, care for, and return a resident to his or her room. At her deposition, Plaintiff was asked how long it would take her to retrieve a resident from Building 13, which appeared from the map to be the most remote of the residential buildings. Plaintiff testified:

> I would not really be able to tell you. I mean because every time you'd even think you [were] going to make it just like that, a resident would be standing in the hallway stopped and talk to you. You'd start going again, then somebody would

>  stop you at medical center, can I have her for a minute, we need to weigh her. I mean as far as doing it in a time, I never really timed it myself. Maybe two minutes or two and a half minutes maybe. I don't know.

On November 21, 2010, Plaintiff learned that she needed to have a hysterectomy. She immediately advised Darin Wall, the administrator of Mason Point, that she would be having surgery and needed six to eight weeks off work. On November 23, 2010, Plaintiff requested a leave of absence pursuant to the Family & Medical Leave Act (FMLA) for the period of December 21, 2010, to February 2, 2011, and submitted a certification signed by her physician, Dr. Jeffrey Pfeiffer. Mason Point granted Plaintiff's request for FMLA leave.

Plaintiff underwent surgery as scheduled on December 22, 2010. Plaintiff testified that, as part of the surgery, they had to do bladder repair and put a mesh lining on her abdomen to hold the bladder up. On or about February 8, 2011, Plaintiff received written permission from Dr. Pfeiffer to return to work on February 14, 2011, but with the restriction that she could not "push over 20 pounds until released to do so." Plaintiff testified that her doctor knew she was a hairdresser and originally told her she could return to work with no restrictions. She told him that she had wheelchairs she had to push and told him how heavy the residents were. Plaintiff testified that he said "you can't be pushing and lifting" and "that's when he made this work release up because he thought I was just a hairdresser who did hair." Plaintiff testified that Dr. Pfeiffer told her that if she started pushing "2 and 300 pound people again, over a repetitive time that's going to tear that loose, and you'll be back

in for bladder repair again."

On February 8, 2011, Plaintiff went to see Wall and gave him Dr. Pfeiffer's written permission to return to work with restrictions. Plaintiff deemed herself unable to push residents in wheelchairs due to her physician's restrictions. Wall advised Plaintiff that he did not think that Plaintiff could work with a 20-pound weight restriction but that he would discuss her request to return to work with his supervisors. Wall testified that Plaintiff was telling him that it was going to be a lifetime restriction and explained her doctor's concern with the surgery and the possibility of damaging the repair of the bladder. Plaintiff testified that Wall told her he was sorry but he did not think "you can come back with the restrictions you have." Plaintiff testified that Wall also said "we just don't allow people to work with restrictions, and you have a restriction on here." Plaintiff testified that she did not believe the 20 pound restriction was going to be permanent. When asked if she pointed out to Wall that the 20 pound limitation would be changed at some point, she stated, "I don't know that I did." In her Declaration, dated September 9, 2013, Plaintiff stated that she never told Wall that she believed the 20 pound weight restriction prescribed by her physician would be a lifetime restriction.

On February 14, 2011, Plaintiff went to Wall's office to once again discuss her potential to return to work at Mason Point. Wall said that he did not think Plaintiff would be able to work with the restrictions she had. Plaintiff testified that Wall told her "[w]e don't allow people with restrictions to work." Plaintiff asked Wall if someone else could push residents for her and whether she could work part time or work in Mason Point's laundry

unit. Wall testified that he told Plaintiff that they were not able to accommodate that. He testified that "[i]t would put a hardship on the facility to hire somebody to transport the patients from the beauty shop to the resident's room and back and forth" so "[t]hat was something that we were not able to do." After Wall refused to permit Plaintiff to return to work with a 20 pound weight restriction, Plaintiff laid her security badge and keys on Wall's desk and left to collect her personal items from the beauty shop.

Plaintiff had one final phone conference with Wall six to eight weeks after February 14, 2011. During that phone conference Plaintiff inquired whether she could apply for the open hairdresser position. Plaintiff did not tell Wall that her restrictions had changed.[2] Wall stated that he could not hire Plaintiff back, given the restrictions he understood she had.

At his deposition, Wall estimated that 70 to 75% of Mason Point's residents require wheelchair transportation to move about. Wall also testified that a beautician spent a very large percent of her time transporting residents to or from the beauty shop. Wall estimated that transporting patients took 60 to 65% of the beautician's time. Wall also estimated that transporting a resident to or from Building 13 would take 10 to 15 minutes. Wall stated that between the building where the beauty shop is located and Building 13 there was a medical center and Main Street Hall, "where you get stopped quite a bit."

---

[2] In fact, the documentation provided by Plaintiff shows that her 20 pound weight restriction was not changed to a 50 pound weight restriction until July 2011. There is no evidence that this information was provided to Wall or anyone else at Mason Point. Also, Plaintiff has not provided any evidence regarding whether this change in the weight restriction would have allowed her to push wheelchairs with residents who weighed between 75 and 400 pounds.

Nancy Burich stated in her declaration, dated September 11, 2013, that she was provided with the assistance of a volunteer or nurse "who would transport any wheelchair bound residents to and from the beauty salon" after Plaintiff left her employment. Burich stated that she "was provided with this assistance until a part-time beautician was hired, at which point I resumed transporting patients with occasional assistance from a volunteer or nurse." Burich also stated that "[t]he average time it would take to transport a wheelchair bound resident from their residence at the Mason Point facility to the beauty salon is between two and one half minutes."[3]

## PROCEDURAL HISTORY

On June 24, 2011, Plaintiff filed a charge of discrimination against Mason Point with the Illinois Department of Human Rights (IDHR). This charge was also automatically filed with the Equal Employment Opportunity Commission (EEOC). On October 19, 2011, IDHR issued a "Notice of Dismissal for Lack of Jurisdiction." On November 10, 2011, the EEOC issued a Notice of Right to Sue.

On January 23, 2012, Plaintiff filed a Complaint in the circuit court of Moultrie County. Plaintiff alleged that she was discriminated against because of her disability in violation of the Americans with Disabilities Act of 1990 (ADA) and the Illinois Human Rights Act (IHRA). Plaintiff also alleged that Mason Point failed to make reasonable accommodations for her disability. On March 8, 2012, Mason Point filed a Notice of

---

[3] This statement is unclear and was most likely meant to state between two and two and one half minutes, which would be consistent with Plaintiff's guess during her deposition.

Removal (#1) and removed the case to this court. Mason Point stated that this court had original jurisdiction over the Complaint because it alleged a violation of the ADA.

On August 12, 2013, Mason Point filed a Motion for Summary Judgment (#23) with attached exhibits. Mason Point argued that it was entitled to summary judgment because Plaintiff was not a "qualified" individual with a disability protected by either the ADA or the IHRA. On September 11, 2013, Plaintiff filed a Memorandum in Opposition to Motion for Summary Judgment (#26), with attached exhibits. She argued that genuine issues of material fact existed regarding whether transporting residents in wheelchairs was an essential function of her job. On September 27, 2013, Mason Point filed its Reply (#29).

ANALYSIS

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not

extend to drawing "[i]nferences that are supported by only speculation or conjecture." *See Singer*, 593 F.3d at 533, *quoting Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), *quoting Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), *citing Celotex Corp.*, 477 U.S. at 322-23.

## ADA CLAIM

The ADA prohibits an employer from discriminating against a qualified individual with a disability. *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000), *citing* 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Bekker*, 229 F.3d at 669, *citing* 42 U.S.C. § 12111(8). Therefore, to establish disability

discrimination, Plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job either with or without a reasonable accommodation; and (3) she suffered from an adverse employment decision because of her disability. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013); *Bekker*, 229 F.3d at 669-70. To establish that she is a "qualified individual with a disability," Plaintiff "must establish not only that she has a disability within the meaning of the ADA, but also that she is qualified for the job, i.e., that she is able 'to perform the essential functions of the job, with or without reasonable accommodation.'" *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010), *citing* 42 U.S.C. § 12111(8).

In this case, Mason Point does not dispute that Plaintiff has a disability. Mason Point has argued, however, that Plaintiff cannot be deemed a "qualified" person with a disability because she cannot perform the essential functions of the position with or without a reasonable accommodation. According to Mason Point, the ability to push residents in wheelchairs is an essential function for a Mason Point beautician. Mason Point noted that Plaintiff candidly admitted during her deposition that, on at least two if not three days a week, she engaged in a lot of walking and pushing of wheelchairs. Mason Point further argued that the magnitude of the wheelchair pushing was such that Plaintiff knew that the function must be re-assigned to another in order to allow her to return to work. Mason Point argued that the accommodation requested by Plaintiff, having someone else transport residents to the beauty shop, was not reasonable or required under the ADA.

In her Response, Plaintiff argued that the "only issue for consideration in determining whether summary judgment is appropriate or not, in this instance, is whether genuine issues of material fact exist" regarding whether "transporting residents in wheelchairs was an 'essential function' of Plaintiff's job." Plaintiff conceded that "[i]t is clear that, in Defendant's judgment, it was an essential function." Plaintiff nevertheless argued that there were issues of material fact, taking issue with Wall's estimate that transporting residents made up 60-65% of her job. Plaintiff also noted that she spent some portion of her work day doing tasks other than those of a beautician. Plaintiff provided her own estimates of the percentage of time she spent transporting residents. Plaintiff estimated that she spent between 6% to 24% of her time transporting residents on Mondays and 12% to 49% of her time on Tuesdays.[4] Plaintiff also pointed out that only a few of the residents who received beauty services on Wednesdays and Thursdays were in wheelchairs. Plaintiff argued that this showed that "the significant majority of Plaintiff's time was spent doing beauty services" and that providing salon and nail services were "clearly the only essential components to Plaintiff's position." Plaintiff also argued that Mason Point could have reasonably accommodated Plaintiff's temporary weight restrictions by having volunteers or CNA's transport residents to the beauty salon. Plaintiff argued that Mason Point provided just this accommodation to Burich after Plaintiff's employment was terminated.

In Reply, Mason Point argued that, under Seventh Circuit precedent, courts do not

---

[4] The lower percentage figure was based upon an estimate that it took two to two and one half minutes to transport a resident one way. The higher percentage figure was based upon Wall's estimate that a one way trip took 10 to 15 minutes.

second guess an employer's judgment as to what functions of a position are essential. Mason Point argued that Plaintiff's concession that, in Mason Point's judgment, the pushing of wheelchairs was an essential function of Plaintiff's job, is therefore significant. Mason Point argued that, because it deemed pushing of residents' wheelchairs to be an essential function of the position and its two beauticians in fact pushed residents in wheelchairs during the course of performing their duties, it is entitled to summary judgment.

To determine whether a job function is essential, a court looks to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position. *Majors*, 714 F.3d at 534, *quoting Rooney v. Koch Air. LLC*, 410 F.3d 376, 382 (7th Cir. 2005); *see also Gratzl*, 601 F.3d at 679. Courts "presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl*, 601 F.3d at 679, *citing Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir. 2001). The Seventh Circuit has stated that "[a]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *Basith*, 241 F.3d at 928, *quoting DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998); *see also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). Also, while the time spent on the function is a consideration, "an essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential." *Basith*, 241 F.3d at 929; *see also Peters*, 311 F.3d at 845.

In this case, this court concludes that consideration of the relevant factors results in a conclusion that picking up and returning residents in their wheelchairs was an essential function of Plaintiff's job as a beautician for Mason Point. It is undisputed that, in Mason Point's judgment, transporting residents in wheelchairs was an essential function of Plaintiff's job. This court also finds persuasive Mason Point's argument regarding the reason for assigning this task to the beauticians on staff. Mason Point argued:

> Mason Point operates a nursing home where many Residents obviously need assistance in moving from one point to another. As the record here establishes, Mason Point's operation is on a campus with Residents residing in buildings other than the building in which the beauty salon is situated. Someone must assist the Residents in getting from their rooms to the salon. Mason Point has elected to place that burden upon the beauticians, and it is appropriate that it do so. As Plaintiff testifie[d], different Residents have different hair care needs and require differing amounts of time to care for those needs. It does not enhance the quality of life for these Residents to be seated in a wheelchair (which may or may not be a comfortable position) and lined up at Mason Point's salon. It is better for the Resident to be brought down only when ready to be served and the beautician is the only person capable of determining when

she is ready to help the next Resident. The imposition of the transportation duty upon the beauticians thus makes perfect sense.

In addition, Plaintiff's testimony showed that she actually spent time during her work day transporting residents, especially on Mondays and Tuesdays. She testified that the routine on Mondays and Tuesdays involved "[a] lot of walking." She also testified that some time was spent on Wednesdays and Thursdays transporting residents. While there is a wide disparity in the parties' estimates of the percentage of Plaintiff's time spent performing this function, this court concludes that this disparity does not raise a genuine dispute of material fact regarding whether this function was an essential function of Plaintiff's job. This is because there is no question that Mason Point considers this function to be essential and Plaintiff testified that she did perform this function when she was working in the position. Burich's Declaration states that, although she was provided temporary help in transporting residents after Plaintiff's employment was terminated, she has resumed transporting residents as part of her job. This court therefore concludes that the evidence regarding the experience of those who previously or currently hold the position confirms that Mason Point actually requires its employees holding the position of beautician to transport residents in wheelchairs to and from the beauty shop.

This court also notes that the lower estimates Plaintiff made regarding the percentage of her time she spent performing this function are not based on definite, competent evidence but were based solely on speculation and conjecture. She testified at her deposition that she

really could not say and did not know how much time she spent making a one way trip to pick up or return a resident. In addition, Burich's statement in her Declaration that the average time it took to transport a wheelchair bound resident was "between two and one half minutes" can only be considered vague and inconclusive.

The written job description in this case, which Plaintiff testified that she had never seen, does not specifically state that transporting residents is an essential duty of the job but does state that "[a]n individual in this position will be required to carry or lift weights in the range of 10 to 50 pounds." After careful consideration, this court concludes that the written job description does not preclude a finding that transporting residents is an essential duty of the job.

Plaintiff also argued that Mason Point could have reasonably accommodated Plaintiff's temporary weight restrictions by having volunteers or CNA's transport residents to the beauty salon. "An ADA plaintiff can establish discrimination by showing the employer failed to accommodate the employee, but she first must establish that she is a qualified individual with a disability." *Majors*, 714 F.3d at 535. Because Plaintiff bears the burden of establishing that she can perform the essential functions of her job "with or without reasonable accommodation," she has not met this burden if the only accommodation she has ever suggested is not reasonable. *See Gratzl*, 601 F.3d at 680. "To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors*, 714 F.3d at 534. In *Majors*, the evidence showed that lifting parts and material weighing over 20 pounds was an essential

15

function of the purchased material auditor position the plaintiff was seeking. *Majors*, 714 F.3d at 534. The plaintiff requested an accommodation that another employee lift heavy objects for her. *Majors*, 714 F.3d at 534. The Seventh Circuit stated that the accommodation the plaintiff sought, another person to perform an essential function of the job she wants, "is, as a matter of law, not reasonable." *Majors*, 714 F.3d at 535*; see also Peters*, 311 F.3d at 845-46. The Seventh Circuit therefore concluded that, because the plaintiff did not meet her burden, the defendant was not required to show that the accommodation requested would create an undue hardship. *Majors*, 714 F.3d at 535, *see also Gratzl*, 601 F.3d at 680 n.4.

In this case, based upon the applicable case law, this court agrees with Mason Point that Plaintiff's proposed accommodation, having someone else transport the residents for her, was not reasonable. This court notes that Plaintiff never informed Wall that her restriction was temporary and Wall believed that Plaintiff was asking for a permanent accommodation. This court does not find persuasive Plaintiff's argument that there was nothing in the written release from Dr. Pfeiffer which indicated that the restriction was permanent because the release said that Plaintiff could not lift or push over 20 pounds "until released to do so," indicating that there was some expectation of a release from the restriction. This court concludes that Plaintiff is reading too much into the wording of the release and has not provided any evidence that she ever requested a temporary accommodation.

Plaintiff has also argued that, because Burich was accommodated after Plaintiff left her employment, Mason Point could have provided the same accommodation to her. Burich's Declaration is clear, however, that the help she received in transporting residents

16

was temporary. She stated that, after a part-time beautician was hired, she "resumed transporting patients with occasional assistance from a volunteer or nurse." Again, because there is no evidence that Plaintiff requested a temporary accommodation, this argument is fails.

Plaintiff has also argued that Mason Point is not entitled to summary judgment because Wall's statements and testimony show that Mason Point was enforcing a "100% healed policy," which is a per se violation of the ADA. *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011), *quoting Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001). Plaintiff argued that, in his deposition, Wall admitted that Mason Point did not allow employees with restrictions to work. Plaintiff argued that, in fact, Wall stated that it was either company policy or practice to not allow employees to return to work.

In its Reply, Mason Point argued that the evidence does not support Plaintiff's argument that Mason Point has a "100% healed policy." Mason Point argued that Wall's testimony was not that Mason Point insisted that employees be 100% healed following injury or illness, but only that they could meet the requirements of the job. Wall testified that employees with restrictions were not allowed to return to work "[i]f it's a lifetime restriction that does not meet the job requirement, yes." Wall clarified that the practice was that employees with lifetime restrictions could not come back to work if they were not able to meet the job requirements in their job description. Wall testified that they tried to accommodate temporary restrictions.

This court agrees with Mason Point that Wall did not testify that Mason Point has a

"100% healed policy." This court concludes that Wall's testimony that employees had to be able to perform the requirements of their job in order to return to work does not demonstrate a per se violation of the ADA.

## IHRA CLAIM

Mason Point argued that the claims Plaintiff brought under the IHRA mirror her claims under the ADA and accordingly fail for the same reason that the ADA claims fail. Plaintiff has agreed that her IHRA claims mirror her ADA claims. The IHRA's prohibitions are essentially the same as the parallel prohibitions found in the ADA. *See Evoy v. Ill. State Police*, 429 F. Supp. 2d 989, 999 (N.D. Ill. 2006). Therefore, because Plaintiff cannot prevail under the ADA, she also cannot prevail under the IHRA. Mason Point is therefore entitled to summary judgment on Plaintiff's IHRA claims.

IT IS THEREFORE ORDERED THAT:

(1) Mason Point's Motion for Summary Judgment (#23) is GRANTED. Judgment is entered in favor of Mason Point and against Plaintiff on all of Plaintiff's claims.

(2) This case is terminated.

ENTERED this 4th day of November, 2013.

s/MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE